# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 15, 2014 Session

## STATE OF TENNESSEE v. HAROLD D. DOSS, JR. AND JOHNATHAN LAMAR HATHAWAY

**Appeal from the Criminal Court for Davidson County**
**No. 2010-D-3315      Mark J. Fishburn, Judge**

**No. M2012-02201-CCA-R3-CD - Filed June 10, 2014**

A Davidson County jury convicted Harold D. Doss, Jr., of first degree felony murder, second degree murder, especially aggravated robbery, and especially aggravated kidnapping. The jury convicted Johnathan Lamar Hathaway of first degree felony murder, especially aggravated robbery, and especially aggravated kidnapping. The trial court merged Defendant Doss's convictions for first degree felony murder and second degree murder and ordered Defendant Doss to serve an effective sentence of life plus thirty years in the Tennessee Department of Correction. The trial court ordered Defendant Hathaway to serve an effective sentence of life in the Tennessee Department of Correction. On appeal, Defendant Doss asserts that: (1) the trial court erred when it denied his motion to sever; (2) the evidence is insufficient to support his convictions; (3) the trial court erred when it admitted hearsay evidence; (4) the trial court erred when it permitted the State to amend the indictment during the trial; (5) his dual convictions for especially aggravated kidnapping and especially aggravated robbery violate his right to due process; and (6) the trial court improperly imposed consecutive sentences. Defendant Hathaway asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court improperly allowed the State to present "unreliable evidence" of cellular telephone tower technology through a Tennessee Bureau of Investigation agent; (3) the trial court erred when it permitted the State to amend the indictment during the trial; (4) there was juror misconduct; and (5) the trial court applied the incorrect law governing circumstantial evidence. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Harold D. Doss, Jr.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Johnathan Lamar Hathaway.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rob McGuire and Sarah Davis, Assistant District Attorneys General for the appellee, State of Tennessee.

## OPINION
### I. Background and Facts

This case arises from the robbery and shooting of Jiro Kanazawa, the victim, who was found dead in the America's Best Value Inn on Brick Church Pike in Nashville, Tennessee. A Davidson County grand jury indicted Defendant Doss for first degree felony murder, first degree premeditated murder, especially aggravated robbery, and especially aggravated kidnapping. The grand jury also indicted[1] Defendant Hathaway, for first degree felony murder, especially aggravated robbery, and especially aggravated kidnapping.

At the October 2011 trial on these charges, the parties presented the following evidence: Donald Robinette testified that he was the Director of Operations for NSU Corporation, a family-owned Japanese company. Mr. Robinette said that NSU Corporation made exhaust components for automotive companies and had two plants in Kentucky: one in Senora and one in Lebanon.

Mr. Robinette testified that he worked with the victim, Jiro Kanazawa. The victim worked in quality control and engineering. Mr. Robinette described the victim as both a co-worker and a friend. At the time of his death, the victim had been working in the United States for a little over two years. Mr. Robinette said that the victim held two degrees: one in applied science that he received in the United States, and the other in economics which he received in Japan.

Mr. Robinette testified that the victim was not at work on October 4, 2009. Mr. Robinette said that this did not raise concern initially because the victim "commonly worked" at both of the factories. Mr. Robinette said that he assumed the victim was working at the other factory on that day. At some point during the day, the victim's "direct boss" called for him. When it became evident the victim was missing, Mr. Robinette stated that "we [ ] started calling hospitals in the Nashville area."

---

[1] For these crimes a Davidson County grand jury indicted Courtney Lashea Hambric and Christopher Doss, in addition to Defendant Doss and Defendant Hathaway. Defendant Doss and Defendant Hathway's cases were tried together and are the subject of this appeal.

Mr. Robinette testified that, at a little after 6:00 p.m., a Kentucky State Trooper arrived and asked if Mr. Robinette recognized a copy of the victim's driver's license. When Mr. Robinette confirmed that the victim was employed by NSU Corporation, the state trooper provided contact information for the Nashville police. Thereafter, Mr. Robinette learned that the victim had been fatally shot. Mr. Robinette and several other NSU Corporation employees met with police in Nashville and gathered information for the victim's family. Mr. Robinette also assisted the police in assembling the victim's bank records.

Ela Vanmali testified that she owned the America's Best Value Inn on Brick Church Pike in Nashville, Tennessee. Ms. Vanmali explained the procedure for checking into the motel. She said that she required identification that included a photograph to "make sure [the person] matche[d] the photo and ID name." She explained that if a person seeking to check-in to the hotel did not have a photo identification, they were declined.

Ms. Vanmali testified that she was working at the motel on Sunday, October 4, 2009. Ms. Vanmali identified a registration card filled out in her handwriting indicating she had checked in someone under the name of "Harold Doss," and she identified her writing of the number for the driver's license provided. Ms. Vanmali confirmed that she would have checked to make sure the person presenting the driver's license matched the photograph on the license. Ms. Vanmali recalled that she rented room 118 to "Harold Doss."

Ms. Vanmali testified that she called room 118 the following morning, Monday, October 5, 2009, right before check-out time at 11:00 a.m. No one answered the telephone, so Ms. Vanmali went to the room and knocked on the door. When again no one answered, she entered the room and saw "somebody laying [sic] there." She said she closed the door and called 9-1-1.

Isaac Wood, a Metropolitan Police Department officer, testified that on October 5, 2009, he was dispatched to a motel located on Brick Church Pike. While en route, Officer Wood was advised that the fire department had already arrived and discovered a deceased body in room 118 at the motel. Once he arrived, Officer Wood entered the motel room and observed the victim, an Asian male, lying on the floor with his feet toward the door. The victim wore only his shirt and underwear. A brown leather belt was tied around one of his wrists, "which made it appear that his hands had been bound together" and a telephone cord was wrapped around his waist with a knot tied on the right side of the victim's body.

Officer Wood testified that he learned the victim's name by checking the tag on a vehicle with a Kentucky license tag parked to the rear of the hotel. Using this name, Officer Wood was able to determine that the victim held a Tennessee driver's license and identified the victim by the driver's license picture.

Felicia Evans, a civilian employee of the Metropolitan Nashville Police Department, testified that she worked in the crime scene investigation unit locating, documenting, collecting, and processing evidence found at a crime scene. Ms. Evans said that, on October 5, 2009, she responded to a crime scene on Brick Church Pike. At the scene, she created a crime scene diagram that was a visual aid that "la[id] out the area of the scene in question." Ms. Evans identified the crime scene diagram that she created of the motel room. Ms. Evans pointed out that the diagram showed the position of items in the room and numbered reference points where various pieces of evidence were found. Ms. Evans then identified photographs taken at the scene.

Ms. Evans testified that a Winchester .9 millimeter Luger cartridge case was located beside the door to the hotel room and next to the victim. Ms. Evans said that the police also found a pair of shoes and socks on the hotel room bed, a telephone cord lying by the pillows, and "a white tip from a latex glove" on top of the bedspread. Another .9 millimeter cartridge casing was found in the room with a lead projectile fragment lying near the casing. In the bathroom vanity area, a third .9 millimeter cartridge case was found and a used wash rag was lying in the sink basin. A fourth .9 millimeter cartridge case was found on the bathroom floor.

Ms. Evans testified that the police found two "apparent strike marks from a projectile" on the shower wall of the bathroom. Around the strike marks there appeared to be blood spatter. Based on these strike marks, police took measurements to help determine the path of the projectile.

Ms. Evans testified that the scene was processed for latent fingerprints in a variety of locations within the hotel room most likely to contain fingerprints. Ms. Evans stated that she submitted the latent prints obtained at the scene to the latent print examiner for analysis.

Laquisha Hughes testified that she first met Defendant Doss in the fall of 2009 at "a club" through a mutual friend and that she and Defendant Doss began dating. The two had been dating a couple of weeks when, on October 4, 2009, she learned Defendant Doss was "talking with someone else." She called Defendant Doss to talk about it, but Defendant Doss told her he "couldn't talk." Ms. Hughes identified Defendant Doss's cellular telephone number as 977-5564. She said she and Defendant Doss called each other "throughout the day," but she could not recall the specific number of times.

Ms. Hughes testified that, at around midnight, Defendant Doss appeared at her house. Ms. Hughes recalled that Defendant Doss entered her house, "gave [her] a hug, and he acted different." Ms. Hughes said she tried to talk with him about "the girl," but Defendant Doss "couldn't really talk to [her]." She said that she would ask him a question, and he would not

respond. She said this seemed "unusual" to her. She asked Defendant Doss what was wrong but, again, he did not respond. Ms. Hughes testified that Defendant Doss had spent the day with "his friends," but she did not know any of their names.

Ms. Hughes testified that, at some point, she and Defendant Doss went to sleep. Later in the night, when Ms. Hughes rolled over, she noticed that Defendant Doss was not asleep but "[j]ust laying [sic] there." The next morning, before Defendant Doss left at 7:30 a.m., he told Ms. Hughes that he would not see her anymore and that he was sorry. Ms. Hughes said she began crying and asked him why. He told her that "everything [wa]s going to be okay" and apologized again. Ms. Hughes said that she assumed he said this because of "the girl." At a later point, Ms. Hughes learned that she was pregnant with Defendant Doss's child. She said she never told Defendant Doss about her pregnancy because she did not see him again.

Courtney Hambric, a co-defendant in this case, testified that she was twenty-three years old and from Greeneville, Tennessee. Ms. Hambric acknowledged that she was currently incarcerated due to pending charges against her related to these crimes. Ms. Hambric said that no threats or promises had been made to her regarding her testimony in this case. Ms. Hambric stated that she hoped she might receive a lesser sentence than the State's original offer but that no one had promised her a lesser sentence.

Ms. Hambric testified that she and a friend were offered the opportunity to stay in Nashville with "some people" they had met "on Vibe Line." She said she stayed with these people until "things went wrong" and then she rented a hotel room for a few weeks. She agreed with the characterization that she was "staying" in Nashville but did not live in Nashville. Ms. Hambric said that she had been in Nashville for about two weeks before the October 4, 2009 incident occurred.

Ms. Hambric testified that, while in Nashville, she worked as an escort. She explained that she placed an advertisement on "backpage" with "revealing" pictures of herself. She said that clients would call her for an appointment, and she would arrange a time and date to meet with the client. Ms. Hambric said that her advertisement indicated that she did "out-calls," meaning she went to the "client," but that she would soon be "doing in-calls," where the "client" could "come to [her]." She said that her advertisement did not list what services she provided and that she discussed her services once she met with the client. Ms. Hambric recalled that the phone number listed in the advertisement was 423-956-9772.

Ms. Hambric testified that the victim called her between 5:30 p.m. and 6:30 p.m. and inquired about her "rates." Ms. Hambric told the victim that she charged $150 for thirty minutes and $200 for an hour. She further informed the victim that she "wasn't available at

the time," which ended the conversation. Ms. Hambric explained that she was unavailable because she did not have transportation to the victim's location.

Ms. Hambric testified that, about an hour later, Christopher Doss, a co-defendant also known as "Cup" or "Cut-Up," called Ms. Hambric, and she asked him to give her a ride to "get a room" in order to meet with the victim. Ms. Hambric said she had known Christopher Doss for about a year and that he was "a friend of a friend." Ms. Hambric said that Christopher Doss understood the nature of Ms. Hambric's work, but she denied that he had any involvement or role in her work. She said that, at the time of these events, one of Christopher Doss's telephone numbers was 615-476-2410. Ms. Hambric could not recall on which telephone he called her on that day. Ms. Hambric said that Christopher Doss agreed to drive her to meet the victim, and she met Christopher Doss at a nearby Advanced Auto Parts store.

Ms. Hambric testified that Christopher Doss arrived at the Advanced Auto Parts store in a dark blue pick-up truck. Defendant Doss and Defendant Hathaway, whom she had never met, were in the truck with Christopher Doss. She recalled that Defendant Doss drove, and Christopher Doss sat in the front passenger seat while she and Defendant Hathaway sat in the back. She said that, when she got into the truck, she asked Christopher Doss if he "had any weed," and he said "no." She then asked if he had a cigar and when he again said that he did not, she asked if they could stop at a store. Christopher Doss told her he would not stop because he was "on a mission." Ms. Hambric said that she understood this to mean that Christopher Doss was going to rob the victim.

Ms. Hambric testified that she called the victim and told him that she would be able to meet with him. When she got off the phone, the three men "started talking about how they were going to rob [the victim]." She said that she determined the location to meet the victim. She explained it was a "regular room" she used at the American Best Value Inn on Brick Church Pike. Once they arrived at the American Best Value Inn, Ms. Hambric realized she did not have her identification with her, so Defendant Doss offered to rent the room in his name. Ms. Hambric provided Defendant Doss with money for the room. When Defendant Doss returned from renting a room, he told her "we're in room 118," and then he parked the car on "the side of the building" where room 118 was located.

Ms. Hambric testified that, after parking the car, they went into the room where Defendant Doss "moved the chair," and Defendant Hathaway removed the telephone cord from the wall "to tie the victim up." She said that both of the defendants looked different in court than they did on the day of the shooting. She explained that Defendant Doss had no facial hair and wore his hair in dreadlocks on the day of the shooting. She said that Defendant Hathaway "wasn't as big as he is now" and did not have "little plaits in his head."

-6-

She said that, at the time of these events, she did not know their names, so when she later spoke with police about these crimes she referred to Defendant Doss as the one with "dreads" and Defendant Hathaway as the "one without." In court she identified Defendant Doss as the "man with the dreads" and Defendant Hathaway as the man with "no dreads."

Ms. Hambric testified that the men began "role playing" how the robbery would take place. It was at this time that Ms. Hambric saw Defendant Hathaway holding a pistol. She said that Christopher Doss had retrieved the gun from underneath the passenger seat of the car and carried it inside the motel room. While the men were "role playing," Ms. Hambric began video recording them with her cellular telephone. She said that Defendant Doss and Defendant Hathaway had their faces hidden with their t-shirts while they were "role playing."

Ms. Hambric testified that the victim called to tell her he was in the parking lot and that she told him the room number. "Just a couple seconds" later the victim knocked on the hotel door. Ms. Hambric explained that, at the time of the victim's arrival, Christopher Doss was in the truck, Defendant Doss was hidden in the bathroom of the motel room, and Defendant Hathway was behind the door. She recalled that when the victim stepped inside the room, Defendant Hathaway stepped out from behind the door pointing the gun at the victim, and Ms. Hambric walked outside. Ms. Hambric described the victim as "really skinny, about a couple inches taller than [her,] and he was dressed really nice and he had a smile on his face."

Ms. Hambric testified that, after exiting the motel room, she walked directly to the truck. When she got inside the truck, Christopher Doss said, "what are you doing, you're messing everything up." She asked him if he wanted her to go back inside the motel room, and he indicated that he did. Ms. Hambric re-entered room 118 where she saw the victim lying on the bed with his pants off, and Defendant Hathaway in the process of tying the victim's hands while Defendant Doss pointed the gun at the victim. Ms. Hambric said that she sat down on the couch and again began video recording the events on her cellular telephone. She said that both of the defendants had their t-shirts tied across the bottom portion of their face. She recalled that Defendant Doss told the victim to give him "the right pin number" for the ATM cards that Defendant Hathaway had taken from the victim. Defendant Doss threatened that he would kill the victim if he did not provide the correct pin number. The victim recited two different numbers for the cards that Defendant Hathaway was holding.

Ms. Hambric testified that Defendant Doss told her to go to an ATM machine with Defendant Hathaway and Christopher Doss. She stated that Defendant Hathaway took the victim's car keys, and they drove the victim's car to a nearby Mapco gas station, while Defendant Doss remained in the motel room with the victim. When they arrived at the gas

station, Defendant Hathaway handed Ms. Hambric the ATM cards and pin numbers and told her to "go get money." Ms. Hambric said she ignored the request until Christopher Doss told her to "go get the money." She said that she went inside the Mapco and withdrew $200. She explained that she initially tried to withdraw $800 and when she was declined, she tried incrementally lower amounts until she received $200. She then withdrew $400 from the other ATM card. Ms. Hambric stated that she gave the money to Christopher Doss.

Ms. Hambric testified that, after leaving the Mapco gas station, Defendant Hathaway drove to an Exxon where Ms. Hambric unsuccessfully attempted to withdraw more money with both cards. On the drive to the Exxon, the two men instructed her "not to touch anything" and to "use the sleeve of [her] jacket" so as to not leave behind a fingerprint. After this second attempt to withdraw money at the Exxon gas station, Defendant Hathaway drove back to the motel and parked the victim's car on the back side of the motel. Ms. Hambric said that she exited the victim's vehicle and returned to the truck with Christopher Doss and Defendant Hathaway. Christopher Doss sat in the driver's seat while Ms. Hambric and Defendant Hathaway sat in the back seat of the truck. Defendant Doss came out of the motel room and got into the front passenger seat. As Christopher Doss began driving away from the motel, Defendant Doss stated that he shot the victim three times because the victim attempted to flee. Ms. Hambric recalled that, when Defendant Doss got into the car, she smelled "a light scent of gun powder." Defendant Doss then stated that he was "going to cut his dreads."

Ms. Hambric testified that Christopher Doss drove her back to where she was staying. On the drive, she observed the victim's wallet in the car. As they pulled up to the apartment complex, she observed the men throw "some stuff" in the dumpster, but she was unsure of what they threw out. She said that she observed Christopher Doss break up the victim's ATM cards and throw them out the window of the truck.

Ms. Hambric testified that, initially, she did not believe Defendant Doss killed the victim. That night she watched the news and did not see a story about a homicide. She called Christopher Doss and told him, "[his] friend don't have to lie to kick it." Several days later she received a text from Christopher Doss instructing her to watch the news. When she did so, she learned that the victim had been shot. She said that she did not contact police because she had an outstanding warrant in Greeneville and did not want to be arrested. Ms. Hambric said she then sent the videos she recorded in the motel room to her sister.

Ms. Hambric testified that on October 20, 2009, Detective Thompson and Detective Haney came to the apartment where she was staying and "picked [her] up." She said that police learned her identity through Abby Arrington, a friend. She explained that she had told Ms. Arrington about the events because the two told "each other everything" and because she

felt remorse about the incident. Ms. Hambric said that she told the detectives that she "met up with Chris [Doss] and they wanted to rob somebody and all they wanted [her] to do was open the door." Ms. Hambric said she then lied to the police, stating that she had lost her cellular telephone along with the video recordings on it. She agreed that she did not initially tell the police about her work as an escort and her advertisement. She stated that she did admit to ownership of the advertisement when confronted with it by police.

Ms. Hambric testified that Detective Thompson showed her photographic line-ups from which she identified Defendant Doss, Christopher Doss, and Defendant Hathaway. Ms. Hambric agreed that she assisted Detective Thompson in recording a telephone conversation with Christopher Doss. During the telephone conversation, Christopher Doss told Ms. Hambric "to stop telling people what had happened" and told her that "this is something that [they] should take to the grave."

Ms. Hambric testified that she did not see Defendant Hathaway after the shooting until a recent court appointment on June 8, 2011. Ms. Hambric recalled that she was sitting on a bench when Defendant Hathaway spoke to her. She did not recognize him, so he kept walking. She later heard someone say his name and realized that he had been involved in the shooting. She and Defendant Hathaway later ended up sharing an elevator in the courthouse, where he asked her to lie about her identification of him and his involvement in the robbery and shooting. Ms. Hambric described the remainder of their conversation as follows:

He asked me if I have anybody helping me out in here, if I have a way to talk to my family, and I said, I'm not from here so I can't just pick up the phone and call home. And he said, well, I got people that you can [c]all. And I said, I'm not calling anybody that you know.

Ms. Hambric said she interpreted these statements to be his attempt to coerce her into recanting her identification of him. Ms. Hambric said that, during her conversation with Defendant Hathaway, she agreed to lie to the police about her identification of him because he "kept going on about it." Ms. Hambric said that she notified her attorney about this contact as soon as was possible after she left court that day.

On cross-examination, Ms. Hambric agreed that she had used marijuana on the day of these events and ecstasy "a couple days before." Ms. Hambric agreed that she had earlier testified that she was not made any promises regarding her sentence in exchange for her testimony. She further agreed that upon her arrest, in response to her question "what am I looking at here?," Detective Thompson discussed with her a possible range of sentence and told her that, if she cooperated, she may be able to "wrap this up in a couple of years."

Tekisha Hambric, Ms. Hambric's sister, testified that she lived in Greeneville, Tennessee. Tekisha Hambric stated that she knew Christopher Doss through an ex-boyfriend and that she did not know Defendant Doss or Defendant Hathaway. Tekisha Hambric confirmed that she received two video text messages from her sister in October 2009. She said that, on the first of the two video text messages, she saw Christopher Doss "walk across the screen." She said the video appeared to be of a motel room, and the sound on the video was not "good." She also described video footage of a man wearing a black shirt tied around his face, holding his arm up like he was holding a gun toward a "pale" man who was on a bed. The man on the bed was "scooting" backward toward the headboard of the bed and away from the man with the black shirt tied around his face. She recalled that the man on the bed was wearing white underwear. Tekisha Hambric said that she did not recognize the man with the black shirt tied around his face but said that the man was not Christopher Doss.

On cross-examination, Tekisha Hambric testified that Detective Thompson had contacted her about the video text messages. She agreed that she told him that her phone had been stolen. She explained that she set it down while in a "Pilot" and then forgot it. She later called the cellular telephone and asked the person who answered her telephone to return it to her. The person agreed to return Tekisha Hambric's cellular telephone to her but never did so.

Russell Thompson, a Metropolitan Nashville Police Department detective, testified that he was the lead investigator assigned to work on the case involving the murder of the victim. Detective Thompson recalled that, when he arrived at the America's Best Value Inn, police officers had already isolated the crime scene area. He spoke with the motel manager and learned that "Harold Doss" had rented the room. Detective Thompson said that the police then began to search for "Harold Doss."

Detective Thompson testified that he looked at the registration card for the hotel room and asked one of the police officers on the scene to "run" the driver's license number listed on the motel registration card. Police officers obtained the photograph associated with the driver's license number listed on the registration card, and the motel manager confirmed that the photograph was of the man who had rented the room. Detective Thompson noted that, in the driver's license photograph, "Harold Doss" wore his hair in dreadlocks, although he did not wear his hair in that manner at trial. Detective Thompson confirmed that the address listed on the registration card was the same address associated with the driver's license number. Based upon all of this information, Defendant Doss became a suspect in the case.

Detective Thompson testified that, within two hours of his arrival on the crime scene, he proceeded to the address listed on the motel registration form and associated with the driver's license for "Harold Doss." Detective Thompson did not find Defendant Doss at his

home address at that time or on any of the following attempts he made to contact Defendant Doss at his home address. He said that he also looked unsuccessfully for Defendant Doss at his workplace. Although scheduled to work, Defendant Doss did not report to work the week following the victim's death. Detective Thompson said that he spoke with Defendant Doss's mother, girlfriend, father, and people with whom Defendant Doss worked, and none of them knew of Defendant Doss's whereabouts. Defendant Doss's mother filed a missing person report with the police department on October 9, 2009, due to his disappearance.

Detective Thompson testified that he arranged with Mr. Robinette to meet with some of the victim's colleagues. He asked Mr. Robinette to gather any of the victim's personal property, such as bank statements or credit cards, that could further the investigation. Through this exchange, Detective Thompson learned that the victim's laptop computer, a phone, and the victim's wallet were missing.

Detective Thompson testified that he attended the victim's autopsy and collected a projectile found in the victim's clothing. Detective Thompson also collected the belt and telephone cord that were found on the victim's body.

Detective Thompson testified that he obtained the bank records associated with the victim's bank account. These records reflected information about the use of the victim's debit card associated with his account. On the document, Detective Thompson pointed out the date a transaction "clears," the transaction amount, a column that indicated whether the withdrawal was authorized, the location of the withdrawal, and the account balance.

Detective Thompson identified on the bank document transactions for the day of the victim's death. At 6:55 p.m., the cardholder made a balance inquiry at an ATM located in a Mapco gas station on Whites Creek Pike in Nashville, Tennessee. The cardholder attempted to withdraw $800 at 6:56 p.m. but the withdrawal was "not authorized." At 6:57 p.m., a withdrawal in the amount of $500 was requested and not authorized. Another attempt was made at 6:58 p.m. to withdraw $300 and this withdrawal was not authorized. Finally, at 6:59 p.m., the card bearer successfully withdrew $200 from the victim's bank account.

Detective Thompson testified about the next set of transactions on the victim's bank account. The records showed that beginning at 7:04 p.m. on the same day, four more unsuccessful attempts to withdraw money were made using the victim's debit card. Three of these attempts were for $600 and the fourth attempt to withdraw funds was for $200. These four transactions were made at an ATM located in an Exxon gas station on Brick Church Pike in Nashville, Tennessee. Based upon this information, Detective Thompson obtained surveillance video from both of the gas stations.

The State first played the surveillance video footage from the Mapco gas station for the jury while Detective Thompson provided orientation as to the layout of the store and the angle from which the camera recorded. Detective Thompson said that the Mapco gas station manager informed him that the video camera timestamp "could be a couple minutes off." Detective Thompson confirmed that the timestamp displayed in the corner of the screen appeared to be "a couple minutes off," but was within the range of time of the transaction indicated on the bank records.

As the jury watched the Mapco surveillance video footage, Detective Thompson identified Ms. Hambric, wearing a pink and black jacket, who entered the store and walked to the ATM. He also identified Christopher Doss, wearing a white shirt, who selected a drink from the cooler and then walked to the cash register to purchase the drink. He identified Christopher Doss walking out of the store and Ms. Hambric exiting behind him. The victim's gold Nissan Maxima can be seen on the recording leaving the gas station parking lot. Detective Thompson stated that he obtained still photographs from this recording that he released to the news media in an effort to seek information identifying the male and female on the surveillance video footage.

The State then played the surveillance video footage[2] from the Exxon gas station for the jury. Detective Thompson stated that the Exxon station was located across the street from the America's Best Value Inn motel. He pointed out a gold Nissan Maxima that entered the Exxon gas station parking lot. Detective Thompson noted that the individual seated in the passenger seat of the vehicle was wearing a white shirt. Ms. Hambric, wearing the pink and black jacket, exited the back passenger's side door of the car. Inside the gas station, Ms. Hambric stood at the ATM. Meanwhile Christopher Doss, wearing the white shirt, got out of the vehicle, walked to a trash can, and then walked around the back of the vehicle before getting back inside the Nissan Maxima. The jury then viewed Ms. Hambric getting back inside the car and the car exiting the parking lot. Detective Thompson noted that the driver of the vehicle did not exit the vehicle at either gas station.

Detective Thompson testified that, at the time he first viewed these surveillance video recordings, he did not know the identity of the individual at the ATM machines. At some point, another detective received a phone call identifying the female at the ATM machines as Courtney Hambric. Detective Thompson obtained a photograph of Ms. Hambric from the Greene County Sheriff's Department and the BackPage.com website to compare with the surveillance video and determined that the person in the surveillance video was Courtney

---

[2] The surveillance footage from the Exxon gas station was damaged and thus unviewable. Because this footage is not contested by either party, we recount only Detective Thompson's testimony about the video surveillance footage.

Hambric.

Detective Thompson testified that he went to an address associated with Ms. Hambric and found her there. He asked her if she would be willing to speak with him at the precinct. She agreed but asked if she could first "get dressed." She went to another room of the apartment and when she returned she was wearing the same pink and black jacket as Detective Thompson had seen on the surveillance video footage. Detective Thompson identified the coat in court and agreed that he had collected the coat as evidence.

Detective Thompson testified that as he walked out to the car with Ms. Hambric, she spontaneously stated, "I didn't know they were going to shoot him and that man didn't deserve to die." Once inside the police car Ms. Hambric continued to talk. Detective Thompson said that he did not ask any questions at the time, preferring to wait until they had reached the precinct. Detective Haney, who sat in the back seat of the unmarked police car, turned on a voice recorder and taped Ms. Hambric's statements.

Detective Thompson testified that once back at the precinct, he recorded his interview with Ms. Hambric, whom he described as "generally cooperative." Detective Thompson said that Ms. Hambric told him that Christopher Doss had "picked her up" in a blue truck and that two men were with him that she did not know. She said that Defendant Doss rented a motel room and hid in the bathroom while Defendant Hathaway hid behind the door. Both men wore shirts covering their faces. She said that she opened the motel room door, that the victim walked into the room, and that she walked out. Ms. Hambric told Detective Thompson that Christopher Doss was outside in the blue truck and told her to go back into the room. When she did, she saw the victim tied up on the bed. She said that she and Defendant Hathaway left the room while Defendant Doss remained in the motel room with the victim. She told the detective that she, Christopher Doss, and Defendant Hathaway drove to a Mapco gas station in the victim's car where she used the ATM, and then they went to an Exxon gas station to use another ATM before returning to the hotel room. She said that Defendant Doss ran out of the room and that they drove away in the truck. The men dropped her off at her apartment where they threw "something" away in the dumpster. Detective Thompson said that Ms. Hambric's statements to him at the precinct were consistent with her trial testimony, including Defendant Doss's admission about shooting the victim once Defendant Doss was in the truck.

Detective Thompson testified that Ms. Hambric referred to Defendant Doss as the "man with dreads" and Defendant Hathaway as "the man without dreads." Detective Thompson confirmed that Ms. Hambric identified Defendant Doss in a photographic line-up even though the picture depicted Defendant Doss without dreadlocks. Ms. Hambric relayed

-13-

all of this information to Detective Thompson before she saw the surveillance video footage.

Detective Thompson testified that, during the interview, Ms. Hambric agreed to be part of a controlled phone call during which she would speak with Christopher Doss about the shooting. During the call, Ms. Hambric referenced the photographs police released to the media of Christopher Doss at the Mapco. Christopher Doss responded with a text message instructing Ms. Hambric to send him "what [she had]."

Detective Thompson testified that, at the end of the interview, he arrested Ms. Hambric for her involvement in the shooting. During the course of his investigation, he spoke with Ms. Hambric's sister, Tekisha Hambric. Tekisha Hambric began telling the detective about the two video text messages her sister, Ms. Hambric, had sent her. She described what she saw on the recordings. Detective Thompson said that he was able to tape a portion of this phone conversation with Tekisha Hambric. After learning about the video recordings, Detective Thompson once again spoke with Ms. Hambric, who admitted video recording the events in the motel room and sending the recordings to Tekisha Hambric. Detective Thompson was unable to recover the video recordings, but he testified that Tekisha Hambric's account of what she saw on the video recordings was consistent with Ms. Hambric's statement about what she recorded.

Detective Thompson testified that Ms. Hambric told him that the first video was of the four defendants in the hotel room "hanging out." She said that Christopher Doss's face can be seen on the recording, as well as Defendant Doss moving a chair in the room. Ms. Hambric told the detective that the second video recording contained footage of the victim tied up on the bed and the two individuals with shirts tied around their head to cover their faces.

Detective Thompson testified that he was unable to locate Defendant Doss until February 2010. He explained that he entered Defendant Doss's information in to NCIC, a national police database that alerts law enforcement anywhere in the country that a specific agency is looking for a given individual. In February 2010, Detective Thompson was notified that Defendant Doss was in custody at the Tarrant County Sheriff's Department in Fort Worth, Texas. On March 18, 2010, Detective Thompson traveled to Fort Worth, Texas, and returned with Defendant Doss.

Detective Thompson said that he did not learn the identity of the fourth suspect until September 10, 2010, when he received information indicating that Defendant Hathaway was the fourth suspect in this case. Detective Thompson said that he created a photographic line-up that included a picture of Defendant Hathaway and showed it to Ms. Hambric. Ms. Hambric identified the photograph of Defendant Hathaway as the fourth suspect. Detective

-14-

Thompson explained that, during the investigation, he had unsuccessfully shown Ms. Hambric photographic line-ups developed from information the police had received about other possible suspects. When Detective Thompson showed Ms. Hambric the photographic line-up containing Defendant Hathaway she "looked at all six pictures and immediately went to [Defendant Hathaway's] picture." Detective Thompson said that Defendant Hathaway came to the police precinct on September 27, 2010, for an interview.

Our review of the recorded interview shows Defendant Hathaway and two detectives in an interview room. Detective Thompson told Defendant Hathaway that he was not under arrest but advised him of the *Miranda* rights. Defendant Hathaway signed a waiver acknowledging his understanding of his rights. Defendant Hathaway denied knowing Defendant Doss. He stated that he played Little League with Christopher Doss as a child and that he had not seen Christopher Doss "in years." He also denied knowing Ms. Hambric. He told the detectives that he did not have a cellular telephone in October 2009. He denied ever being at the America's Best Value Inn on Brick Church Pike.

In the recorded interview, Detective Thompson told Defendant Hathaway that a man was murdered in one of the rooms at the America's Best Value Inn and that Defendant Doss, Christopher Doss, and Courtney Hambric were all charged with first degree murder for the victim's death. Detective Thompson explained that police knew there was a fourth suspect and that Defendant Hathaway's name had recently come up as the potential fourth suspect. Defendant Hathaway denied any involvement and denied any association with the three charged suspects. Detective Thompson reviewed with Defendant Hathaway the police theory of the case based on the evidence recovered during the investigation. Defendant Hathaway again denied any involvement, claiming he was with his wife who was admitted to the hospital for leg injuries. Defendant Hathaway agreed to provide police with a DNA sample but later withdrew his permission. He maintained that he did not know any of the suspects in the case and that he had no involvement in these crimes.

Detective Thompson testified that he submitted Defendant Hathaway's fingerprints for comparison. Defendant Hathaway's fingerprint matched a print obtained from the interior door of room 118 at America's Best Value Inn. Detective Thompson said that, at some point, he obtained a DNA sample from Defendant Hathaway and submitted it to the Tennessee Bureau of Investigation ("TBI") for analysis.

Detective Thompson testified that he obtained the telephone records for the victim's cellular telephone and Christopher Doss's cellular telephone. Detective Thompson identified the telephone records and pointed out where the telephone records reflected telephone calls placed between the victim's cellular telephone and Ms. Hambric's cellular telephone on October 4, 2009, between 4:16 p.m. and 6:18 p.m. Detective Thompson then discussed

-15-

Christopher Doss's telephone records, noting a call that Christopher Doss placed on October 3, 2009, at 10:28 p.m. to the telephone number Defendant Hathaway provided to police as his cellular telephone number during the police interview. On October 4, 2009, the records show that Christopher Doss placed multiple telephone calls to Ms. Hambric beginning at 6:27 p.m. At 6:46 p.m., Defendant Doss called Christopher Doss's cellular telephone. Beginning at 6:58 p.m. until 7:13 p.m., multiple telephone calls are placed from Christopher Doss's telephone to Defendant Doss's cellular phone. Detective Thompson explained the significance of these times were that the times were within the time frame of ATM withdrawals using the victim's debit cards.

On cross-examination, Detective Thompson testified that Ms. Hambric would not confirm the identity of Christopher Doss on the gas station surveillance footage. He agreed that she also refused to sign the photographic line-up containing a photograph of Christopher Doss. He explained that she immediately identified Christopher Doss upon seeing his photograph but that she then refused to sign the identification, only writing in the date. Detective Thompson agreed that Ms. Hambric signed the document on which she identified Defendant Doss. Detective Thompson confirmed that, based on the physical evidence documentation form, twenty-nine different items in the motel room were "swabbed" and submitted for further analysis. Detective Thompson agreed that none of the latent prints were a match to Defendant Doss.

Detective Thompson confirmed that the bank records indicated only one successful withdrawal at the Mapco gas station in the amount of $200. Detective Thompson stated that he thought the victim had multiple cards but was unaware of any other accounts.

On redirect examination, Detective Thompson testified that the only "definitive person" who could have confirmed there was only one bank account involved in these crimes was the victim. Detective Thompson explained that the victim's family resided outside the United States.

Michael Stewart, a custodian of records for Cricket Communications, testified that his job required him to maintain call detail records and documents for the company. Mr. Stewart explained that call detail records typically show the telephone number that placed the call, the number that received the call, the date and time of day of the call, and the cell phone tower that routed the call. Mr. Stewart said that this call detail information was stored in a database for six months after the occurrence.

Mr. Stewart testified about cell tower information in relation to the location of the cellular phone in use. He read the following Cricket company statement about cell towers:

[T]he maximum design of our towers is typically twelve miles in rural areas with bad terrain. In areas that are urban, densely populated and dense with building and other structures, et cetera, . . . this design range is typically significantly reduced, in many cases it could be less than a mile. The only purpose of the towers is to be part of a network that provides good wireless to our customers. The actual range rather than the design range can vary from moment to moment because of the call volume, weather, obstructions, foliage, et cetera.

Mr. Stewart stated that cell tower information did not provide the exact location of the cellular telephone in use but rather provided a general area of use. Further, the tower used to route a call was not always the closest cell tower to the user but was the tower with the strongest signal.

Michael Frizzell, a TBI special agent in the technical services unit, testified that his duties with the TBI included helping investigators obtain and analyze telecommunication records. Agent Frizzell stated that he had attended conferences that addressed call detail record analysis and that he had also received specific forensic training for "the forensic examination of the actual cell phone."

Agent Frizzell testified that he helped prepare the visual presentation in this case as a testimonial aid for a particular cricket phone number. He explained that he obtained "an official map" of the Davidson County area that included cell tower locations from Metro Mapping and Planning. The map also included information he had provided from the call detail records and the locations of the Mapco gas station, Exxon gas station, and America's Best Value Inn at issue in this case.

Agent Frizzell testified that cell towers cover a certain range but that range can be reduced by weather, foliage, or buildings. Agent Frizzell noted that Cricket provided a ten to twelve mile range for cell towers in a rural area. He stated that Nashville would be considered a more densely populated urban area, which would result in a shorter range for cell towers. Agent Frizzell stated that, in his experience, records showing the use of different towers to transmit calls over a shorter span of time indicated movement of the user because the tower with the strongest signal is going to route a call. Agent Frizzell said that cell phone detail records provide general geographical location and not specific location of the cellular telephone user.

The State re-called Detective Thompson. Detective Thompson confirmed that he obtained a subpoena for Defendant Doss's cellular telephone records. He stated that the cellular telephone number 977-5564 was registered under the subscriber name Tameka

Dixon, Defendant Doss's sister. The subscriber address for the account was the same address provided on Defendant Doss's driver's license.

Detective Thompson testified that the phone records indicated that Defendant Doss called Christopher Doss's cellular telephone on October 4, 2009, at 6:46 p.m., 6:58 p.m., and 7:06 p.m. Detective Thompson noted that it was during this time period that the victim's bank account was either accessed or there was an attempt to access the account at the Mapco gas station and at the Exxon gas station. Referencing the map created by Metro Mapping and Planning, Detective Thompson traced the cell tower usage on October 4, 2009. At 4:41 p.m., the phone associated with Defendant Doss accessed calls through a tower located near where Defendant Doss's father and uncle lived. At 5:08 p.m., the cellular telephone associated with Defendant Doss used a cell tower located more closely to the Advance Auto Parts store where Ms. Hambric was picked up. For the next hour and forty-five minutes, the cellular telephone accessed calls through a tower located approximately .57 miles from the America's Best Value Inn. From 7:37 p.m. to 7:53 p.m., the cell tower accessed was located near where Ms. Hambric was staying. At 9:05 p.m. the tower located near where Defendant Doss's father lived was again used for routing calls. From 9:45 p.m. on October 4, 2009, until 12:48 a.m. on October 5, 2009, the cell tower accessed was located approximately a half a mile from Laquisha Hughes's residence. Detective Thompson said that from around midnight until approximately 10:30 a.m. on October 5, 2009, there were no calls between Defendant Doss and Ms. Hughes.

Detective Thompson testified that the locations of the cell towers used to route calls were consistent with Ms. Hambric's version of the events and Ms. Hughes's statements that Defendant Doss spent the night at her home. Detective Thompson noted that a call between Christopher Doss and Defendant Doss occurred at 6:59 p.m., when, according to bank records, the victim's debit card was first used at Mapco and then again at 7:04 p.m., when the victim's debit card was used at the Exxon.

Don Carman, a retired TBI forensic division special agent, testified as an expert witness in the field of ballistics. Mr. Carmen stated that he had evaluated the four shell casings that police had submitted to him in this case. Mr. Carmen stated that "all of these are the same manufacturer, they're nine millimeter cartridge cases, all been fired, Winchester manufacture." Based upon his evaluation of the shell casings, Mr. Carmen determined that all four shell casings were fired from the same weapon. A projectile found in the motel room was also submitted for evaluation. Mr. Carmen stated that the projectile was consistent with a projectile that would have been fired through a nine millimeter weapon.

Linda Wilson, a Metropolitan Nashville police department identification analyst, testified as an expert in the field of latent print identification. Officer Wilson stated that part

of her duties with the police department include comparing latent prints to determine the source of the print. Officer Wilson explained that all latent prints submitted can not be used for comparison. She stated that there must be ridge detail in order for her to examine and compare the latent print. If a latent print is smeared, disturbing the ridge detail, she would be unable to examine the print and the latent print would be identified as "no value."

Officer Wilson testified that she received a set of latent prints taken from the victim's car. All of the latent prints taken from the victim's car were deemed "no value." Officer Wilson said that she also received a set of latent prints taken from the motel room. A latent print recovered from the interior of the door to room 118 was identified as Defendant Hathaway's fingerprint. Office Wilson stated that she also found latent prints that matched Courtney Hambric's fingerprint.

Dr. Laura Boos, a TBI special agent in the serology DNA unit, testified as an expert in the field of serology and DNA comparison. Dr. Boos stated that her analysis showed that Defendant Doss could not be excluded as a contributor of the genetic material found on the belt ligature wrapped around the victim's hands. Further, Defendant Doss could not be excluded as a contributor of the genetic material found on the telephone cord. Her analysis revealed that Defendant Hathaway's DNA profile matched the genetic material found in the latex glove tip that was lying on the bed in the hotel room. A second contributor was also found in the genetic material from the glove tip. The victim and Ms. Hambric were excluded as contributors of the genetic material; however, Defendant Doss could not be excluded as the contributor.

Dr. Thomas Deering, a Davidson County senior associate medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Deering stated that he performed the autopsy of the victim on October 4, 2009. Dr. Deering said that he found two gunshot wound paths on the victim. The victim had an entrance wound right at his left collar bone and the exit wound was on the back side of his neck. Dr. Deering said that the bullet injured the edge of the victim's trachea, the right side of the thyroid gland, and lacerated a portion of the internal carotid artery before exiting through the victim's neck. Dr. Deering noticed a pattern of stipple marks on the left side of the victim's neck. Based upon his observation of the entrance wound and surrounding area, Dr. Deering stated that he believed the gun was placed against the victim's skin when it was fired. Due to the bleeding attendant to injury of the carotid artery, Dr. Deering stated that this wound "ha[d] certainly a potential to be a lethal wound."

Dr. Deering testified about the other gunshot wound path. He stated that the projectile traveled through both of the victim's arms and his chest. The projectile entered the victim's left arm, traveled through the arm, and then entered the left side of the victim's chest. The

bullet traveled between two of the victim's ribs and perforated the right atrium of the victim's heart. It then struck the right lung before exiting the right chest cavity through intercostal spaces 6 and 7. The projectile proceeded through the victim's right arm and stayed inside the victim's clothing where Dr. Deering recovered the bullet. Dr. Deering stated this gunshot wound was fatal. Dr. Deering estimated that the victim would have maintained consciousness for approximately five to eight seconds and died within a "number of minutes." Dr. Deering testified that the cause of the victim's death was multiple gunshot wounds and the manner of death was homicide.

Patricia A. Hathaway, Defendant Hathaway's mother, testified on Defendant Hathaway's behalf. Ms. Hathaway testified that her brother's funeral was on October 3, 2009, and Defendant Hathaway attended the funeral. She identified her brother's obituary, which listed his funeral date as October 3, 2009. At this time, Defendant Hathaway lived with his mother in Hendersonville. Ms. Hathaway said that she could not say exactly where Defendant Hathaway was at a specific time on those days but that he was "in and out of the home" on October 3, 2009, and the following day, October 4, 2009. Mrs. Hathaway said that Defendant Hathaway's weight at trial was consistent with his weight in October 2009.

On cross-examination, Ms. Hathaway agreed that she never told the police that, due to her brother's funeral, Defendant Hathaway was with her on October 3 and 4. She stated that, instead, she told this to the attorney who was representing Defendant Hathaway at the time.

Based on this evidence, the jury convicted Defendant Doss of first degree felony murder, second degree murder, especially aggravated robbery, and especially aggravated kidnapping. The jury convicted Defendant Hathaway of first degree felony murder, especially aggravated robbery, and especially aggravated kidnapping. The trial court merged Defendant Doss's first degree felony murder conviction with the second degree murder conviction. The trial court sentenced Defendant Doss to serve life in prison for the murder conviction, thirty years for the especially aggravated robbery conviction, and thirty years for the especially aggravated kidnapping conviction. The convictions for especially aggravated robbery and especially aggravated kidnapping were to run concurrently with one another but consecutively to the murder conviction, for an effective sentence of life plus thirty years in the Tennessee Department of Correction. The trial court sentenced Defendant Hathaway to serve concurrent sentences of life in prison for the first degree felony murder conviction, thirty years for the especially aggravated robbery conviction, and thirty years for the especially aggravated kidnapping conviction, for an effective sentence of life in the Tennessee Department of Correction. It is from these judgments that the defendants appeal.

## II. Analysis

On appeal, Defendant Doss asserts that: (1) the trial court erred when it denied his motion to sever; (2) the evidence is insufficient to support his convictions; (3) the trial court erred when it admitted hearsay evidence; (4) the trial court erred when it permitted the State to amend the indictment during the trial; (5) his dual convictions for especially aggravated kidnapping and especially aggravated robbery violate his right to due process; and (6) the trial court improperly imposed consecutive sentences. Defendant Hathaway asserts that: (1) there is insufficient evidence to support his convictions; (2) the trial court improperly allowed the State to present "unreliable evidence" of cell phone tower technology through a Tennessee Bureau of Investigation agent; (3) the trial court erred when it permitted the State to amend the indictment during the trial; (4) there was juror misconduct; and (5) the trial court applied the incorrect law governing circumstantial evidence. We address each appellant's issues in turn.

## A. Defendant Doss
## 1. Severance

Defendant Doss asserts that the trial court erred when it denied his request for severance of the defendants. He claims that the admission of Defendant Hathaway's recorded interview unfairly prejudiced him. Defendant Doss does not object to the statements made by Defendant Hathaway in the recording, but to the statements made by Detective Thompson in explaining his theory of the case. The State responds that the trial court acted within its discretion when it denied Defendant Doss's motion to sever the defendants. We agree with the State.

The Tennessee Rules of Criminal Procedure address the severance of defendants in Rules 8, 13, and 14. Rule 8( c) provides that an indictment, presentment, or information may charge two or more defendants:

> (1) if each of the defendants is charged with accountability for each offense included:
>
> (2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or
>
> (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:
>
>> (A) were part of a common scheme or plan; or

(B) were so closely connected in time, place, and occasion that it would
be difficult to separate proof of one charge from proof of the others.

When two defendants are joined for trial, as is the case here, a defendant may move for a severance "because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant . . . ." Tenn. R. Crim. P. 14(c)(1). If the trial court determines that the State intends to offer the statement at trial, the trial court shall require the State to elect:

(A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

(B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

(C) severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1)(A)-(C)). The decision to grant or deny severance rests within the sound discretion of the trial court. *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981)). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *Id*. (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)). This Court cannot interfere with the exercise of discretion afforded to the trial court absent a showing of clear abuse. *Id*. (citing *Coleman*, 619 S.W.2d at 116).

Prior to the swearing in of the jury, Defendant Doss argued that the trial court should not allow Detective Thompson's recorded interview with Defendant Hathaway to be introduced at trial because Detective Thompson's questions were based upon knowledge he had gained from his interviews with Ms. Hambric. He further argued that the admission of the recording was the State's attempt to improperly bolster Ms. Hambric's testimony. After reviewing the transcript of the interview, the trial court ordered that Detective Thompson's statement, "I believe personally that [Defendant Doss] is the shooter" be redacted. The trial court noted that all other statements were posed in the form of a hypothetical, "If it's Harold Doss that did it," rather than a statement that Defendant Doss was the shooter. The trial court stated that it would instruct the jury that statements made by a police officer during an interview are not evidence and that the statements are only to be considered for the interviewee's response. The trial court further noted that, in the interview, Defendant Hathaway did not agree with any statements during the interview and maintained full denial

of any acquaintance with the co-defendants or knowledge of the events.

During the trial before the recording was played, the trial court gave the following instruction to the jury:

> [T]he State has prepared to introduce into evidence the interview of Johnathan Lamar Hathaway conducted by Detectives Russell Thompson and David Cotsman, I hereby instruct you that this evidence may be considered by you only as it relates to the guilt or innocence of Mr. Hathaway.  It cannot be considered by you for any reason regarding Mr. Harold Doss, Jr.  Furthermore, you are instructed that the statements, remarks and questions of the detectives contained in the interview are not evidence against Mr. Hathaway and cannot be considered by you as such unless Mr. Hathaway agreed with the statement, remark or question, otherwise the inclusion of the detective's theories of or comments about the case is simply to place in context the responses to Mr. Hathaway.

On appeal, Defendant Doss challenges "the statements of the Detective setting forth his theory of the case, delivered with the imprimatur of law enforcement, which were derived from the testimonial hearsay statements of severed, non-testifying codefendant Christopher Doss."

The Defendant has not shown that the trial court abused its discretion when it denied his motion to sever.  The specific statements challenged by Defendant Doss are as follows:

> " . . . I've been investigating this case almost a year."

> "Here's the story I got."

> "You [Hathaway] and Harold [Doss] and Chris [Doss] picked up Courtney [Hambric].  Courtney sets up a date with a Japanese man from Kentucky, at the hotel room.  You get to the hotel room, set up a plan.  Chris stays outside, you and Harold and Courtney go in the room.  When the man shows up, Courtney opens the door for him, lets him in, you and Harold tie him up on the bed.  The three of you, you and Courtney and Chris leave in his car.  Go to two different markets, withdraw money from the ATM machine.  You stay in the car.  You then return [,] Harold comes running out and said he had to shoot the man and he's dead in the hotel room.  And you all leave in Harold's truck. You then get dropped off over at the apartments on White's Creek Pike.  You and Harold and then that's kinda the end of your involvement that night."

-23-

"[A]nd the evidence has been building for a year. And the, myself, the district attorney's office, we've talked about it."

"Chris [Doss] has been in jail for six months or longer on this."

"When you can tell us up front that, 'I was just there. I didn't have nothing to do with it. Harold did the shooting.'"

A motion to sever pursuant to Tennessee Rule of Criminal Procedure 14(b)(1) addresses statements of one co-defendant about another co-defendant in a joint trial. Defendant Doss does not challenge Defendant Hathaway's statements, but instead he challenges Detective Thompson's statements made during Detective Thompson's interview of Defendant Hathaway. In our view, Detective Thompson's statements to Defendant Hathaway during Detective Thompson's interview of Defendant Hathaway were not offered into evidence to prove the "truth of the matter asserted," therefore, the statements are not hearsay. *See* Tenn. R. Evid. 801(c). Detective Thompson's statements gave context to the questions that he asked Defendant Hathaway during his interview. The interview was properly admitted into evidence, and the trial court properly instructed the jury concerning their consideration of this evidence.

Accordingly, the trial court did not abuse its discretion when it denied Defendant Doss's motion to sever based upon the State's offer of a recorded interview between Defendant Hathaway and Detective Thompson. Defendant Doss is not entitled to relief as to this issue.

## 2. Sufficiency of the Evidence

Defendant Doss asserts that the evidence against him was insufficient because the State failed to provide evidence to corroborate Ms. Hambric's accomplice testimony. The State responds that sufficient corroborating evidence was presented at trial for a jury to find that Defendant Doss committed these offenses. We agree with the State.

It is well-settled law in Tennessee that a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004). The determination as to whether a witness is an accomplice or not may be a matter of law for the trial court's determination or it may be a question of fact for the jury's determination. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). When the facts are clear and undisputed concerning a witness' participation in the crime, whether he is an accomplice is a question of law for the court to decide. When the facts are

-24-

in dispute or susceptible to different inferences, it becomes a question of fact for the jury. *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975).

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). To satisfy the definition of an accomplice, it is not enough that the witness merely possess guilty knowledge, is morally delinquent, or even participated in a distinct but related offense. *See State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The general test in determining whether a witness is an accomplice is whether the alleged accomplice could be indicted for the same offense. *Allen,* 976 S.W.2d at 666.

The law in Tennessee regarding the corroboration required for accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Ultimately, it is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. *Pennington v. State*, 478 S.W.2d 892 (Tenn. Crim. App. 1971).

Defendant Doss was convicted of first degree felony murder, second degree murder, especially aggravated robbery, and especially aggravated kidnapping. The evidence presented in the light most favorable to the State showed that Defendant Doss, Defendant Hathaway, Christopher Doss, and Ms. Hambric drove to the America's Best Value Inn on Brick Church Pike. Ms. Hambric had arranged to meet the victim at this location under other pretenses. Defendant Doss rented a motel room, and Ms. Hambric conveyed the room number to the victim. Defendant Doss hid in the bathroom of the motel room while Ms. Hambric opened the door to the victim. Defendant Doss held the victim at gunpoint while Defendant Hathaway, Christopher Doss, and Ms. Hambric drove in the victim's car to nearby gas stations to access money from ATMs using the victim's debit cards. Upon their return to the motel,

Defendant Doss ran out of the motel room, got into the truck, and stated that he had killed the victim. Defendant Doss then left the state and fled to Texas where he was later apprehended.

Defendant Doss contends that the State relied "almost exclusively" on Ms. Hambric's testimony to convict him of these offenses. Ms. Hambric testified that she worked as an escort and arranged to meet the victim at the America's Best Value Inn on Brick Church Pike. She stated that Christopher Doss agreed to meet her at the Advanced Auto Parts store and drive her to meet the victim. When Ms. Hambric met Christopher Doss at the Advanced Auto Parts store, Defendant Doss, and Defendant Hathaway were with him. Ms. Hambric described Defendant Doss to police as the "man with dreadlocks." On the drive to the motel, the three men began discussing a plan to rob the victim. Ms. Hambric stated that, because she forgot her identification, Defendant Doss rented the motel room in his name using his identification. Once inside room 118, Defendant Doss and Defendant Hathaway "role-played" the robbery. When the victim arrived at the hotel, he called Ms. Hambric who gave him the room number. Ms. Hambric recorded portions of these events on her cellular telephone, and she sent the recordings to her sister. She said the video showed Defendant Doss with a t-shirt tied around his face role playing the robbery plan. Ms. Hambric said Defendant Doss hid in the bathroom while Ms. Hambric opened the door for the victim. Ms. Hambric testified that Defendant Doss held the gun on the victim while Defendant Hathaway took the victim's debit cards. She said Defendant Doss stayed with the victim while the others went to use the victim's debit cards at nearby gas stations. When they returned from withdrawing money from the victim's account, Defendant Doss came out to the truck and announced that he had killed the victim.

Ms. Hambric's testimony is corroborated by the motel registration card listing Harold Doss as the person renting room 118. The registration card contained Defendant Doss's signature, his home address, and his driver's license number. Defendant Doss's driver's license photograph portrays him with his hair in dreadlocks. The owner of the motel, Ms. Vanmali, testified that she rented room 118 to Defendant Doss on October 4, 2009. Cellular telephone records for Defendant Doss's cellular telephone indicated the presence of his cellular telephone in the area of these crimes at the time of the crimes. Ms. Hambric's sister testified that her sister sent her a video of the events that had occurred that evening. She said that it depicted two men with t-shirts tied around their faces. Defendant Doss's demeanor on the night of the shooting and his statements to Ms. Hughes the morning after, when he stated he would not see her again, corroborate the other evidence indicating his involvement in these crimes. DNA testing showed that Defendant Doss could not be excluded as a contributor of the genetic material found on the telephone cord. The DNA profile on a tip of a latex glove matched Defendant Hathaway and there was also genetic material from a second contributor. The victim and Ms. Hambric were excluded as contributors of the genetic material; however, Defendant Doss could not be excluded as the contributor. Finally, evidence was presented

that Defendant Doss fled to Texas following these crimes. We conclude that all this evidence "fairly and legitimately tends to connect" Defendant Doss with the crimes against the victim. *Bigbee*, 885 S.W.2d at 803.

Accordingly, we conclude that there was sufficient evidence upon which a jury could find beyond a reasonable doubt that Defendant Doss, during the commission of a robbery, shot and killed the victim. Defendant Doss is not entitled to relief as to this issue.

### 3. Hearsay

Defendant Doss challenges the trial court's admission of the photographic line-up from which Ms. Hambric identified him. Defendant Doss asserts that Detective Thompson's notation on the photographic identification form that Ms. Hambric identified Defendant Doss as the shooter is improper hearsay. The State responds that the statement at issue is an extrajudicial identification of a defendant and, therefore, an exception to the rule against hearsay. We agree with the State.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c)). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). Certain exceptions, however, exist, including one relevant to the issue raised in this case. *See* Tenn. R. Evid. 803(1.1).

Detective Thompson showed Ms. Hambric a photographic line-up that included a photograph of Defendant Doss. Ms. Hambric circled the photograph of Defendant Doss, and signed and dated the identification. Detective Thompson also filled out another sheet referred to as a photograph identification form. Detective Thompson explained this form to the jury, explaining that the form included "basic information of everything, people - people's whose names correspond with the photographs, my information, the case number, date, time, who I'm showing it to and who they may or may not have made an identification, and then a brief comments section, kind of a narrative of what was said . . . ." On the photograph identification form, Detective Thompson wrote "she pointed to [Defendant Doss's picture] and identified him as the shooter." This document was admitted into evidence.

Although this testimony is hearsay, as noted, we believe it to be an exception under Rule 803(1.1) of the Tennessee Rules of Evidence. This section provides an exception to the hearsay rule for "[a] statement of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." The Advisory Commission Comments to this rule state the following:

-27-

Tennessee recognizes declarations of eye-witness identification as an exception to hearsay exclusion, and the rule generally follows Tennessee precedent. Note that the declarant must also be a witness, affording at least delayed cross-examination as to the extrajudicial statement. Note also, however, that witnesses other than the declarant may testify about the identifying declaration.

At trial Ms. Hambric testified about her identification of Defendant Doss in the photographic line-up, and she was subject to cross-examination as required by the rule. Detective Thompson also testified regarding Ms. Hambric's identification of Defendant Doss in the photographic line-up, as contemplated in Rule 803(1.1). Accordingly, we conclude that the trial court did not abuse its discretion when it allowed Ms. Hambric's extrajudicial identification of Defendant Doss into evidence. Defendant Doss is not entitled to relief as to this issue.

## 4. Amendment of the Indictments

Defendant Doss contends that the trial court erred when it allowed the State to amend the indictment after jeopardy had attached and over the defendants's objection. The State concedes that this was error but asserts that the error was harmless.

The record evinces that, during the trial, the State informed the trial court that its indictment contained a typographical error. The indictment charging Defendant Doss with especially aggravated robbery incorrectly listed the victim's name as the property taken rather than the victim's debit cards. The State asked to amend the indictment to correct this error asserting that it was a typographical error and "superfluous language," as the property taken was not an element of especially aggravated robbery. Defendant Doss's counsel objected to the amendment, arguing that the State had to prove that property was taken from the victim, and, therefore, the indictment was deficient. The trial court allowed the amendment, finding that a typographical error in this case would not change any of the elements of the offense.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. *State v. Lindsey*, 208 S.W.3d 432, 437-38 (Tenn. Crim. App. 2006) (*citing* U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000)). Our Courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Lindsey*, 208 S.W.2d at 438 (*citing Wyatt*, 24 S.W.3d at 324). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in

such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." *Id*. (citing T.C.A. § 40-13-202). An indictment need not conform to strict pleading requirements. *State v. Hill*, 954 S.W. 2d 725, 727 (Tenn. 1997).

> Tennessee Rule of Criminal Procedure 7(b) provides:
> (b) Amending Indictments, Presentments and Informations.
>
> > (1) With Defendant's Consent. With the defendant's consent, the court may amend an indictment, presentment, or information.
> >
> > (2) Without Defendant's Consent. Without the defendant's consent and before jeopardy attaches, the court may permit such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced.

The Tennessee Supreme Court continues to emphasize the relaxation of common law pleading requirements, as well as its reluctance to promote form over substance in examining the sufficiency of an indictment. *See State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). Indictments that satisfy the requirements for adequate notice to the defendant also satisfy constitutional and statutory requirements. *Id*. Correction of an "unintentional drafting error" does not charge an additional or different offense nor prejudice a substantial right of the defendant if the indictment clearly charges the essential elements of the offense. *State v. Beal*, 614 S.W.2d 77, 80 (Tenn. Crim. App. 1981).

In the case under submission, we conclude that the trial court did err when it allowed the State to amend the indictment after jeopardy attached. We must now consider whether this error was harmless. We conclude that the language of the indictment, along with the specific reference to the statute allegedly violated, provided Defendant Doss with ample notice of the offense charged. The indictment stated facts constituting the offense, including the name of the defendant, the date of the alleged offense, and the statute violated.

Accordingly, because the indictment was sufficient prior to its amendment and no new or different offense was charged, we conclude that the error was harmless. Defendant Doss is not entitled to relief as to this issue.

### 5. Jury Instruction on Kidnapping

Defendant Doss argues that the trial court erred when it failed to instruct the jury on

"substantial interference" as to his especially aggravated kidnapping charge, pursuant to *State v. White*, 362 S.W.3d 559 (Tenn. 2012). The State responds that Defendant Doss has waived our review of this issue for failure to raise it in his motion for new trial or at the motion for new trial hearing. We agree with the State.

The Tennessee Rules of Appellate Procedure state that "no issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties, or counsel, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(d); *See e.g.*, *State v. Mayo*. 735 S.W.2d 811, 816 (Tenn. Crim. App. 1987) (holding that the defendant waived an issue on appeal for failing to raise it in the motion for new trial); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). Because the Defendant did not challenge this issue in his motion for new trial or the hearing on the motion, he has waived this issue on appeal.

### 6. Consecutive Sentencing

Defendant Doss's final issue on appeal is a challenge to the trial court's application of consecutive sentencing. The State responds that the trial court properly considered the *Wilkerson* factors in considering whether Defendant Doss was a dangerous offender before imposing consecutive sentences. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). This standard also applies to our review of a trial court's decision to impose consecutive sentences. *State v. James Allen Pollard*, – S.W.3rd –, No. M2011-0032-SC-R11-CD (Tenn. Dec. 20, 2013). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of

reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed.* The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4).

At the sentencing hearing, the trial court stated that it had considered the evidence presented both at trial and the sentencing hearing, the presentence report, sentencing principles, arguments of counsel, the nature and characteristics of the conduct, enhancement and mitigating factors, and the potential for rehabilitation. The trial court noted that Defendant Doss had two prior convictions for aggravated robbery and, at the time of these offenses, was on parole.

The trial court considered consecutive sentencing and whether Defendant Doss was a dangerous offender for sentencing purposes. In considering Defendant Doss's previous convictions, the trial court stated that Defendant Doss had previously committed similar crimes for which a parole board believed the Defendant had been rehabilitated and granted parole. While out on parole, Defendant Doss committed the same offenses, evincing both a need to protect the community from further crimes by Defendant Doss and Defendant Doss's lack of potential for rehabilitation. The trial court stated, "He appears to have just gone back into what got him in the penitentiary in the first place."

The trial court considered the specific facts related to the offenses, noting that Defendant Doss did not "just rob" the victim. Defendant Doss participated in binding the victim, rendering the victim helpless. Even after stealing the victim's debit cards and pin numbers, completing the robbery, Defendant Doss continued to detain the victim, ultimately

shooting and killing the victim. Finally, the trial court determined that the sentence was reasonably related to the offense based on the continued restraint of the victim, the circumstances surround the shooting, and Defendant Doss's relatively short period on parole before committing similar crimes. The trial court noted that the evidence indicated that there was "no justification" for the shooting, as the victim was bound and helpless at the time of his murder. Based upon these findings, the trial court found that consecutive sentencing was appropriate.

Our review of the record reflects that the trial court did not err when it ordered consecutive sentencing. The Defendant's criminal record consists of four prior aggravated robbery convictions, two felony escape convictions, one aggravated burglary conviction, one assault conviction, one second-degree burglary conviction, and six other convictions. The trial court imposed consecutive sentencing, pursuant to Tennessee Code Annotated section 40-35-115, on the basis that the Defendant was a dangerous offender who held "little or no regard for human life" and had "no hesitation about committing a crime" where the risk to human life would be high. *See* T.C.A. § 40-35-115(b)(4). The trial court noted that given the Defendant's criminal history, the length of his sentence was "justly deserved" considering the seriousness of his convictions.

Furthermore, the trial court classified the Defendant as a dangerous offender in imposing consecutive sentencing and properly considered the requisite *Wilkerson* factors in doing so. *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). In order for a trial court to find a defendant should serve his sentences consecutively based on his classification as a dangerous offender, *see* T.C.A. § 40-35-115(b)(4), the four *Wilkerson* factors must be satisfied: (1) the Defendant's behavior indicated little or no regard for human life; (2) he did not hesitate to act when the risk to human life was high; (3) extended confinement is necessary to protect society; and (4) the total length of the sentence must reasonably relate to the conviction offenses. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *Wilkerson*, 905 S.W.2d at 939.

We conclude that the trial court did not err by ordering consecutive sentencing for the Defendant. Given the Defendant's prior robbery convictions, we agree that the Defendant has shown no hesitation about committing crimes when the risk to human life is high. The facts of his current conviction, where he held a gun on and shot a partially clothed, unarmed, and bound victim, indicate that his regard for human life is non-existent. Moreover, his use of a weapon, despite his previous felony convictions, and his continued criminal conduct while on parole indicates that it is necessary to protect the public from this Defendant. The evidence supports the trial court's finding that the Defendant should serve his sentences consecutively. The Defendant is not entitled to relief.

**B. Defendant Hathaway**
**1. Sufficiency of the Evidence**

Defendant Hathaway argues that the evidence is insufficient to support his convictions for first degree felony murder, especially aggravated kidnapping, and especially aggravated robbery. The State responds that there was sufficient evidence upon which a jury could find Defendant Hathaway guilty beyond a reasonable doubt of these offenses. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy ." T.C.A. § 39-13-202(a)(2) (2010). In this case, the Defendant was convicted of first degree felony murder in the perpetration of an aggravated robbery. The mental state required for this conviction was that the Defendant possessed the intent to commit the aggravated robbery, which was the underlying offense.

A conviction for especially aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" with the use of a deadly weapon and the victim suffered serious bodily injury. T.C.A. §§ 39-13-401(a), -403 (2010).

Especially aggravated kidnapping, as applicable to the case herein, is defined as the knowing and unlawful removal or confinement of another "so as to interfere substantially with the other's liberty" and accomplished with a deadly weapon. T.C.A. §§ 39-13-302, -305.

The evidence, presented in the light most favorable to the State, showed that Defendant Hathaway, Defendant Doss, Christopher Doss, and Ms. Hambric drove to the America's Best Value Inn on Brick Church Pike. Ms. Hambric had arranged to meet the victim at this location under other pretenses. Defendant Doss rented a room, and once inside, Defendant Hathaway took the telephone cord from the wall. Defendant Hathaway and Defendant Doss

"role played" the robbery before the victim's arrival at the motel. Ms. Hambric recorded this on her cellular phone and sent the recording to her sister. Once the victim arrived, Defendant Hathaway hid behind the door with a gun. Ms. Hambric opened the door to the victim and as he entered, Defendant Hathaway stepped out pointing the gun at the victim. Defendant Doss held the victim at gunpoint while Defendant Hathaway tied the victim. Defendant Hathaway took the victim's debit cards and drove Christopher Doss and Ms. Hambric in the victim's car to nearby gas stations to access money from two ATMs using the victim's debit cards. Upon their return to the hotel, Defendant Doss ran out of the hotel room, got into the truck, and stated that he had killed the victim. Defendant Hathaway's fingerprint was found on the inside of the motel room door and his DNA was found on the tip of the latex glove found on the bed in the room.

Defendant Hathaway's assertion that he had "very limited involvement" is undermined by the State's evidence against him. Defendant Hathaway tied the victim up with phone cord, took the victim's debit cards, and drove Ms. Hambric to the ATM to withdraw money from the victim's bank account. During the perpetration of the robbery of the victim, the victim was shot and killed. Accordingly, we conclude that the State presented sufficient evidence upon which the jury could find the Defendant guilty beyond a reasonable doubt of first degree felony murder, especially aggravated robbery, and especially aggravated kidnapping. Defendant Hathaway is not entitled to relief as to this issue.

## 2. TBI Special Agent Frizzell's Testimony

Defendant Hathaway asserts that the trial court erred when it allowed the State to present "unreliable evidence" about cellular telephone tower technology through Special Agent Frizzell's testimony. He argues that Agent Frizzell was "unqualified to provide any interpretive testimony regarding the use of cell phone towers to track the location of an individual phone." The State responds that because Defendant Hathaway did not object to the introduction of this testimony he has waived appellate review. We agree with the State.

Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Tennessee Rule of Evidence 103(a)(1) also provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection." When a party does not object to the admissibility of evidence, the evidence becomes admissible, notwithstanding any other evidentiary rule to the

-35-

contrary, and the jury may consider that evidence for its "natural probative effect as if it were in law admissible." *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981).

At trial, Agent Frizzell testified, with no objection, regarding a visual aid he helped develop for trial. Defendant Hathaway declined to ask any questions on cross-examination. During the State's redirect examination, Defendant Doss's attorney objected to a question and the objection was overruled. Accordingly, we conclude that Defendant Hathaway has waived our review of this issue.

### 3. Amendment of Indictment

Defendant Hathaway makes the same challenge to the amendment of the indictment for especially aggravated robbery as we addressed earlier as one of Defendant Doss's issues on appeal. Defendant Hathaway, however, made no objection at trial to the State's amendment. Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Although Defendant Hathaway raised no objection to the amendment, even had he done so, we have already determined that any error resulting from the State's delayed amendment of the indictment was harmless.

### 4. Juror Misconduct

Defendant Hathaway argues that the trial court erred when it failed to notify "all parties" that he knew one of the jurors, who later became the jury foreman. The State responds that Defendant Hathaway has waived our review of this issue for failing to timely raise it in his motion for new trial. We agree with the State.

Defendant Hathaway filed his motion for new trial on April 18, 2012. In it he alleged six errors, none of which was juror misconduct. The hearing on both defendants' motions for new trial was held on October 4, 2012. Thereafter, on October 10, 2012, Defendant Hathaway filed an amended motion which included the allegation about the trial court's failure to disclose his relationship with a juror.

The Tennessee Rules of Appellate Procedure state that "no issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties, or counsel, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion

for new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(d); *See e.g.*, *State v. Mayo*. 735 S.W.2d 811, 816 (Tenn. Crim. App. 1987) (holding that the defendant waived an issue on appeal for failing to raise it in the motion for new trial); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). The State correctly notes that, in *State v. Hatcher*, 310 S.W.3d 788 (Tenn. 2010), our Supreme Court held that "amendments to timely filed motions for new trial may be had 'until the day of the hearing on the motion for a new trial,' Tenn. R. Crim. P. 33(b) (emphasis added), but not after the trial court has entered an order denying a new trial." *Id*. at 803. Accordingly, Defendant Hathaway has waived this issue.

## 5. Standard for Circumstantial Evidence

Defendant Hathaway asserts that the trial court instructed the jury on the wrong standard for circumstantial evidence. The State responds that the trial court correctly used the standard adopted in *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011). We agree with the State.

The standard laid out in *State v. Crawford*, required the State to present proof "so strong and cogent as to exclude every other reasonable hypothesis save guilt of the defendant, and that beyond a reasonable doubt." 470 S.W.2d 610, 612 (1971). In January 2011, our Supreme Court issued *Dorantes*, which adopted the federal standard that the sufficiency of the evidence standard was the same for circumstantial or direct evidence. 331 S.W.3d at 381. The *Dorantes* court cited a Supreme Court case regarding the standard enunciated in *Crawford* as "confusing and incorrect" to require an additional instruction. *Id*. at 380. The trial in this case was in October 2011; however, Defendant Hathaway argues that he was indicted in October 2010 before the *Dorantes* opinion and, therefore, the old standard should have applied.

The State correctly notes that both the Tennessee Supreme Court and this Court began utilizing the same standard for direct and circumstantial evidence shortly after the issuance of *Dorantes* to cases in which the crimes had occurred before January 2011. *See State v. Sisk*, 343 S.W.3d 60, 62 (Tenn. 2011) (crimes committed in 2006); *State v. Parker*, 350 S.W.3d 883, 888, 903 (Tenn. 2011) (crimes committed in 2003); *State v. Martinez*, 372 S.W.3d 598, 601, 604-05 (Tenn. Crim. App. 2011) (crimes committed in 2008).

Defendant Hathaway contends that he should have been afforded the circumstantial rule that was in effect at the time of the commission of the offenses rather than the "new, more relaxed standard." The Tennessee Supreme Court in *Dorantes*, however, noted that "[i]n practice, the distinction between the federal standard and the 'reasonable hypothesis' language

used in our state has rarely made a difference" thus providing "little reason to refine" the standard. *Dorantes* 331 S.W.3d at 380.

Accordingly, we conclude that the trial court did not err when it used the standard announced in *Dorantes*. Defendant Hathaway is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE